UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ALL POINTS CAPITAL CORP. :
:
VS. : C.A. NO. 2005-305-ML
:
BEACON PRESS CORP., :
ANTHONY RITACCO, and MARY :
RITACCO :

DEPOSITION OF ANTHONY RITACCO, a Defendant in the above-entitled cause, taken on behalf of the Plaintiff, before Ronald M. Ronzio, a Notary Public in and for the State of Rhode Island, at the Office of Chace Ruttenberg & Freedman, LLP, One Park Row, Suite 300, Providence, Rhode Island, on December 7, 2006 at 2:00 P.M.

PRESENT:

FOR THE PLAINTIFF . . CHACE RUTTENBERG & FREEDMAN, LLP
BY: DOUGLAS J. EMANUEL, ESQUIRE

FOR THE DEFENDANTS . . OLIVERIO & MARCACCIO, LLP
BY: RAYMOND MARCACCIO, ESQUIRE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500
www.alliedcourtreporters.com

# I-N-D-E-X


| WITNESS | PAGE |
|---|---|
| ANTHONY RITACCO | |
| Examination By Mr. Emanuel . . . . . . . | 3 |
| Examination By Mr. Marcaccio . . . . . . | 62 |
| Re-Examination By Mr. Emanuel . . . . . . | 65 |
| Re-Examination By Mr. Marcaccio . . . | 66 |
| Further Examination By Mr. Emanuel . . | 67 |


# E-X-H-I-B-I-T-S


| NO. (Plaintiff's) | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition (3pp) . . . . . . . . . . | 3 |
| 2 | Amended consent judgment (3pp) . . . . . . . . | 14 |
| 3 | Copy of letter dated February 10, 2006 to Catherine Wilinski from Anthony Ritacco (1pg) . . . . . . . . . . . . . . . . | 19 |
| 4 | Copy of letter dated February 13, 2006 to Anthony Ritacco from Anthony Peretine (1pg) . . . . . . . . . . . . . . . . | 26 |
| 5 | Copy of letter dated February 10, 2006 to Ken Ubert from Joel Chase (2pp) . . . . . . . | 35 |
| 6 | Copy of letter dated September 5, 2006 to Anthony Ritacco from Catherine Wilinski (2pp) . . . . . . . . . . . . . . . . | 41 |
| 7 | Copy of letter dated September 8, 2006 to Catherine Wilinski from Anthony Ritacco (2pp) . . . . . . . . . . . . . . . . | 44 |
| 8 | Copy of letter dated September 11, 2006 from Anthony Ritacco to Catherine Wilinski (1pg) . . . . . . . . . . . . . . . . | 48 |
| 9 | Promissory Note (4pp) . . . . . . . . . . . . | 49 |
| 10 | Copy of email from Gus Izurieta (1pg) . . . . | 57 |
| 11 | Copy of email from Joel Chase (1pg) . . . . . | 59 |

(DEPOSITION COMMENCED AT 2:10 P.M.)

ANTHONY RITACCO

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Would you state your name and spell your last name.

THE WITNESS: Anthony Ritacco, R-I-T-A-C-C-O.

EXAMINATION BY MR. EMANUEL

Q. Good afternoon, Mr. Ritacco. My name is Douglas Emanuel. You may remember or know that I represent All Points Capital Corporation.
A. Right.
Q. And I have requested your presence at this deposition. From time to time, I'm going to show you some documents and I'm going to start with this first one if you would please mark that.

(PLAINTIFF'S EXHIBIT 1 MARKED FOR IDENTIFICATION)

Q. Mr. Ritacco, I'm going to show you what's been marked Plaintiff's Exhibit 1 for the purpose of the deposition. Is that a document that you've ever seen before?
A. No.
Q. You've never seen this?

A. No.
Q. If you flip to the third page of the document, there's something called a Schedule A. Have you seen this page before?
A. No.
Q. So I'm to understand that you did not know that you were asked to bring documents with you today?
MR. MARCACCIO: Objection. And for the record, I reviewed Schedule A with him. I don't know if I actually showed it to him.
A. This is the one from March -- yes, okay, I'm sorry. This one here he reviewed with me yesterday.
Q. And have you, since yesterday, produced the documents that have been requested on Schedule A?
A. The only documents that I produced are the sale for the home in Warwick. That's the only one that I have available. I don't have anything else.
MR. MARCACCIO: Just for the record, I just received that. I have not made a copy of it, but that is a full copy. If we do take a break, you can make a copy for me. I would appreciate it.
A. That's the refinancing of the house.

Q. Mr. Ritacco, have you ever been at a deposition before?
A. No.
Q. I'm going to ask you a series of questions; and if I do my job right, I'm hopeful that you'll give a series of answers to those questions.
A. Yup.
Q. One of the hardest things about a deposition, and this has nothing to do with Anthony Ritacco, this is human nature in general, one of the hardest things for anybody to do is to let me finish my question before you give me the answer that you're expecting to give. The reason I would ask you to do your best to not talk over my questions is because the gentleman to your right is taking down every word that is said here today. Later on, if your testimony today becomes something we need to look back upon, both Mr. Marcaccio and myself are going to look at his transcript. So, if we end up talking over each other, the transcript has a lot of letters that don't mean anything together.
A. Okay.
Q. So, despite his abilities, which are fantastic, so to best of my ability, I'm going to let you give me the answers, and I would just, to the best of

your abilities, let me finish the questions, that would be great.
A. Yup.
Q. I can tell already you're very good at giving verbal answers. If you were to shrug your shoulders or nod your head, those can't be transmitted into a transcript either. So, if you can continue what you've demonstrated to be an ability to give verbal answers, that would be appreciated. Okay?
A. Yup.
Q. Do you understand that you just took an oath to tell the truth?
A. Yes.
Q. Did you understand that oath when you took it?
A. Yes.
Q. And if I were to tell you that that oath is similar to an oath that someone would take in a courtroom, except you're in my law office, do you understand the significance of that oath?
A. Yes, I do.
Q. If, at any time, you need a break, glass of water, trip to the bathroom, this is not intended to be a torture chamber, it's just a way of getting some information. So, if you need something, just let

us know and we'll be happy to stop. The one wrinkle I put on that is if there's a question pending, I'd ask you to please answer the question and then we'll accommodate whatever it is that you need. I got burned on this one before, so I'm going to ask you this. Do you read and write English?

A. Yes.

Q. I've got to ask that one. Is there anything in your system now that you think will impair your ability to remember events that have occurred?

A. No, just my brain.

Q. Fair enough. I should say any non natural things in your system. Okay. So, now I'm going to start asking you questions. I appreciate your indulging me all of those little ground rules. Mr. Marcaccio has presented several folders and one envelope of documents. I assume that he got them from you?

A. Yes.

Q. Have you made an extensive search for the documents that have been requested of you?

A. Yes.

Q. And subject to any privilege that Mr. Marcaccio may have discussed with you about communications

with your attorneys, is this all of the documents that are out there that are responsive to my request?

A. To my knowledge.

Q. How did you go about finding these documents that were produced?

A. I searched through some old filing cabinets that I had, boxes, filing boxes.

MR. MARCACCIO: I should supplement that by saying that I have taken what is Schedule A, reviewed it, spoken to Mr. Ritacco, and then gone to Mr. Chase's office, reviewed all of his records in an attempt to cull out anything that would be responsive. So the only exception to that should be the communications between counsel and co-counsel on this side. So Mr. Chase, Mr. Smith, any communication with respective attorneys, including me, but I am now part of the case, I did my best also to provide the communications between this office, Chace Ruttenberg, and Mr. Chase, and I did the best I could with that. I believe I did provide all of that.

MR. EMANUEL: Fair enough. Thank you, Mr. Marcaccio.

Q. Mr. Ritacco, we're not -- I do not intend to spend

a lot of time on talking about the business of Beacon Press and the lease that you had with All Points Capital Corporation. I would, however, just like to hit a couple of background points.

A. Okay.

Q. Just to establish some things. I don't want you to think we're re-litigating everything that has been done before; but at some point -- can you tell me a little bit about the business of Beacon Press, when it was in business?

A. Yes. We printed newspapers and magazines and circulars and fliers. I started the business in 1979. I closed the doors in April 2005.

Q. And at some point, Beacon Press required -- excuse me, acquired what I'm going to call a Fast 300, is that a printing press?

A. It's a press, yes.

Q. Can you tell me a little bit about the Fast 300 printing press.

A. The Fast 300 is a newspaper printing, code web printing operation. It prints newspaper types of publications. I bought it through Integra International which was a -- had offices in Philadelphia, somewhere in the outskirts of Philadelphia. They, in turn, represented Raghbeer

Limited, which is the producer of the Fast 300. They gave me the opportunity to put in a press I thought which would be good. They gave me a -- it cost me $800,000 for the press. It was a million six is what the original cost. They were going to use my facility as a prototype to sell it throughout the country. So at that point, we went ahead with the situation. I got involved with Comquip, which is a leasing company, who in turn sold it to All Points Capital. They -- from the start, we ordered it in September 2004. We did not receive the press. It got stuck in Customs for about six months. We did not receive the press until February of 2005. Then in February 2005, they attempted to assemble it. At that point, I had a program where I would pay $3,018 a month or somewhere in that area for six months until the press was up and running. However, I had to start paying from the time it was shipped from Raghbeer International in India. So, all the prepayments that I made, the press was never in my building. So then it went to $9,700 a month and it still was not up and running, and I was paying $9,700 a month from February until August of -- until the time that -- the three or four months

that we put it in, we couldn't get it to run. They kept telling me it was my fault, my installers, my this, my that. Make a long story short, I put an input of about $450,000 of my own money to keep the company going. Finally, in April, I went to Cathy and I said to Cathy, I can no longer pay for the press at this point in time. She said we will pursue vigorously to get our money. I said I understand that, but I'm telling you that I cannot -- I'm going out of business because I cannot afford to keep this press going. Then from that time -- from that time -- from May -- from April, May, June, until I told her we were going -- I had paid her somewhere in the neighborhood of $30,000. Then from there, you know what the rest of the story is from here, you know.

Q. When you mentioned Cathy --

A. Wilinski.

Q. I have to develop some things for the transcript. Cathy is Cathy Wilinski?

A. Yes.

Q. Of All Points Capital?

A. Right.

Q. When you purchased the press --

A. Yes.
Q. -- it was financed?
A. Yes.
Q. From Comquip?
A. Comquip.
Q. And how much did Comquip lend you?
A. $610,000.
Q. And Comquip, my understanding is that Comquip then assigned that --
A. To All Points. That's absolutely right.
Q. So your obligations came to be --
A. I don't know --
Q. Hold on.
A. I'm sorry, okay.
Q. Your obligations, then, were to pay All Points --
A. Right.
Q. -- for the loan that Comquip had made to you?
A. That's absolutely right.
Q. Are you familiar with the --
A. Can I interject something?
Q. Sure.
A. I don't think at that point All Points Capital did any due diligence because when they absorbed the $610,000, we were readily in a big fight with Raghbeer for the nondelivery of a

press, and all the things that happened up to that point, but they didn't seem to care at that point, okay.
Q. I believe you said you started Beacon Press sometime in the '70's?
A. 1969.
Q. I apologize. 1969. In your 30 plus years of running a business, did you ever become familiar with the term, "a secured interest"?
A. Yes.
Q. Do you know what that means?
A. Yes. I'm responsible to pay if something goes wrong.
Q. Are you familiar with the concept of security for an obligation?
A. Aren't they the same? I don't think -- I assume they're the same.
Q. Okay. So, there came a time, right, that All Points filed a lawsuit against yourself individually and Beacon Press?
A. That's absolutely right.
Q. And that lawsuit ended in an agreement?
A. Right.
Q. Between yourself and Beacon Press and All Points?
A. Right. That's right.

MR. EMANUEL: Okay. Ask you to mark this as Number 2, please.

(PLAINTIFF'S EXHIBIT 2 MARKED FOR IDENTIFICATION)

Q. If you could look -- just as a technicality, when we're looking at documents, Mr. Ritacco, I need you to be looking at the ones that have the official looking red stamp on it because these documents become part of this transcript. So, it's assumed that you're looking at the one that's part of the transcript. I apologize for that, but we need you to do that. This document that you're looking at, Exhibit 2, is this something that you've seen before?

A. Yes.

Q. Yes?

A. Yeah.

Q. And on Page 3, it is signed by Robert W. Smith on behalf of Beacon Press Corp., Anthony Ritacco, and Mary Ritacco. And Mr. Smith was your attorney during this litigation?

A. Yes.

Q. And am I correct that Exhibit 2 is the agreement that I was referring to that resolved the litigation between All Points Capital and Beacon

Press Corp., Anthony Ritacco, and Mary Ritacco?
THE WITNESS: You mean this judgment here?
MR. EMANUEL: Yes.
A. Yes, yeah.
Q. And under this judgment, you were required to make payments of $608,000 over time?
A. Right, over seven years.
Q. This was entered, I believe, if you look at the last page, on December 2, 2005.
A. Okay. If you say so.
Q. I do.
A. Okay.
Q. I appreciate your faith. If you can recall back on or around December of 2005 --
A. Yup.
Q. -- where was the Fast 300?
A. Still at Beacon Press on 132 Meadow Street.
Q. What was the condition of the Fast 300 at the time?
A. Covered, in excellent condition.
Q. When you say covered, like with a tarpaulin or something?
A. Yes.
Q. If someone had flipped the switch, would it have

worked?
A. No.
Q. Did it ever work?
A. Well, yes, but the electricity had been taken off it at that point because the building had been sold, and the people allowed me to keep the press there until they needed for me to move it. So --
Q. That's a fabulous answer because you answered the question I asked you. Let me ask you a different question. If it had been plugged in and hooked up to the electricity and someone flipped a switch, would it have worked?
A. Absolutely.
Q. So, it was in working condition, although it was off-line?
A. Yes, right. Well, it depends on what you mean by working condition. Was it able to function as a press? No. Was it -- because it never functioned as a real press.
Q. Okay. What did it function as?
A. It supposedly was built as a press, but it never functioned as a press that I could utilize, okay. So we ran paper through it, but that's all it could do.
Q. It was supposed to do other things?

A. That's right. It was supposed to be able to print.

Q. It never printed?

A. Not really. It printed, but not to anybody's satisfaction.

Q. If I could just go through this briefly with you, this amended consent judgment, I promise it will be brief. Paragraph 3 required, by agreement, Mary Ritacco, who I understand to be your wife?

A. Right.

Q. To transfer the property at 26 Alger Avenue back to Anthony and Mary as tenants by the entirety?

A. That's absolutely right.

Q. And did that happen?

A. Yes.

Q. It also required an initial payment at the time of the signing of this agreement in the amount of $6,500, and just for your reference and for Mr. Marcaccio, I'm looking at Paragraph 6C. Was that payment made?

A. I would say yes.

Q. And it also required a payment by December 15, 2005?

A. Right. I'm sure, yes, all payments were made. So, yes.

Q. But, excuse me, strike the but there.
Paragraph 6C talks about payments and I'm directing you to the last two lines of Paragraph 6C, payments once a month for the next six months thereafter upon the 15th day of each such month.
A. Right.
Q. In the amount of $6,500?
A. Right.
Q. Do you recall whether on February 15th, which would have been two months after, you made a payment of $6,500?
A. Yes, I did.
Q. You did?
A. Yes.
Q. All right. Now, there came a time -- well, you mentioned Cathy Wilinski earlier?
A. Yes.
Q. Have you dealt with anybody else directly at All Points Capital?
A. Peretine after -- the letter came from, I don't know, Michael Peretine.
Q. I think it's Anthony Peretine?
A. Anthony Peretine, but everything else was with Cathy Lewinsky (sic).
Q. Wilinski. You've got President Clinton on the

brain, I think. So, am I correct that at some point -- well, let's look at this. Let's look at Number 3.

(PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION)

Q. Ask you to look at what's been marked as Exhibit 3.
A. Okay.
Q. And have you seen this document before?
A. Yes, I have.
Q. And is that your signature on the bottom?
A. Yes, it is.
Q. Do you have any sons or fathers that are named Anthony Ritacco?
A. A son.
Q. Is it Anthony?
A. Yes.
Q. What is his middle initial?
A. He doesn't have a middle initial.
Q. Okay. I'm just trying to confirm that every time I see Anthony A. Ritacco, that's you.
A. Right, it is.
Q. And what is this document that's in front of you? And, yes, I understand sometimes these questions are rather silly.

A. Okay. It's a letter I sent to Cathy Wilinski saying that we had an agreement to -- that I would settle the debt for $175,000 -- 475,000, and then that I would -- well, I'll just read it, "The additional monthly payments -- "

Q. Just slow down for the gentleman's fingers so he doesn't sprain his fingers.

A. "This will include the $5,000 payment made July 29th, December 13th, and January 11th." There also was a payment in November that they didn't include in there. "I am in the process of sending the February check of $6,500," which was done. "Any additional monthly checks that you receive prior to the refinancing will also be credited against the $475,000. I also understand that if the financing is not completed by March 15th, I am to make interim payments of $100,000 at that time, and also my understanding is based upon this revised agreement, All Points no longer has any interest in the Fast 300."

Q. I want to focus your attention on the first paragraph of this letter. The first line says, "At your request, I'm following up on today's phone conversation."

A. Right.

Q. What do you remember about that phone conversation as you sit here now?
A. I called Cathy and said to her -- the reason I called her was, I go back to the first day that I called her and told her that I was going to default on the loan. She says we will oppose this vigorously. I said I understand that. She said but in the meantime, if ever you need to talk to me, call me. I said fine. So as we went along on that basis, I said to myself, it's worth a phone call to see if I can settle this judgment. So, I called her on the phone. I said, Cathy, I'd like to make a proposal. I will settle this thing for $475,000. She said fine. She said I will get back to you. She got back to me. Said fine. I sent this letter at that time. Then the next letter I received was the letter from Anthony Peretine.
Q. We'll get to that one, too, I promise.
A. Okay.
Q. Your language -- did you type out this letter that's Exhibit 3 in front of you?
A. Yes. Well, Joel's office typed it for me.
Q. I want to look at the big paragraph. Starting on the second line of that big paragraph towards the

right, and it says, "When the refinancing is completed, I will pay All Points an amount equivalent to $475,000 minus all payments made to date on your previous agreement."
A. Right.
Q. You used the word "refinancing is completed," do you see those words?
A. Yup.
Q. What is a refinancing of a house?
A. To get as much money as I could to satisfy All Points Capital.
Q. And had you already contacted banks about refinancing your house when you wrote this letter?
A. No, I don't think I had.
Q. Had you ever refinanced a house prior to this occasion that you were discussing?
A. Well, not refinance, no.
Q. You financed?
A. Yes.
Q. And when you originally financed your house --
A. Yup.
Q. -- when the bank, I'm using finance as a bank loans you money for the purpose of buying a house.
A. Right.
Q. When the bank loaned you the money to buy your

house, did it make that loan to you once or was it on a series of partial disbursements?
A. Once.
Q. When -- you mentioned refinancing your house.
A. Yes.
Q. Did you expect one disbursement from the bank?
A. Yes.
Q. Had you talked to the bank, at any bank, forgive me, I think I asked you this. By this time, had you talked to a bank about your house?
A. I don't think so.
Q. How was it that you knew that you going to be able to refinance your house for $475,000?
A. I didn't know that because I really -- at that point, I knew that I couldn't get 475,000. The valuation that you had made was $484,000, that you had the house appraised at. I went through and I got them to give me 500,000. That's the maximum that I could get based on my salary, my income, and what they would give me. So, I knew that I couldn't get 475,000.
Q. Then why, if you don't mind my asking, when you say the refinancing is completed, I will pay All Points in an amount equivalent to $475,000, if you knew you couldn't?

A. Well, first, I guess for two basic reasons. The first one is that there are $24,500 that they took off this letter, if you refer back to Peretine's letter. I've got to get to that. I've got to refer to both of them. So, therefore, that was an additional $24,500. At that time, I said to Cathy Wilinski, when they sent me the letter of the 13th, that I didn't think that I could comply to get it all at once. Her quote was to me that you'll have to make some arrangements to pay it off. That was her quote to me over the phone. Then I received a letter of February 13th which I have to refer to because in that letter it states to me that continued payments will be made until the $475,000 is paid.

Q. We'll get to that.

A. Okay. And that's why I didn't -- I didn't have -- had they put a stipulation in the letter as to the date it had to be paid, I certainly would have paid it. I would not have defaulted on 475,000 as opposed to 610,000.

Q. But you put a date in here by saying when the refinancing is complete, didn't you?

A. I don't read it that way because they changed the agreement of the letter. This was my letter.

The letter that I signed was their letter.
Q. Fine. I understand that. I'm looking at the letter -- your proposal, okay. Your proposal says I'll pay you $475,000 when the refinancing is complete.
A. Okay.
Q. Right?
A. Yeah. I assume that's -- yes, the letter says that, the letter states that. Okay. Really, it's a play on words, but anyway --
Q. Well, they're your words.
A. They're Peretine's words in the other letter. You can't have your cake and eat it, too.
Q. I'm looking at your letter.
A. Okay. Okay.
Q. Your letter proposes that you will pay $475,000 --
A. Right.
Q. -- out of the --
A. Under this agreement. Under the agreement that all payments will be made up until that time. They changed that agreement, okay. All right. I'll concede to what you're saying.
Q. Your proposal of February 10 says you will pay $475,000 when the refinancing is completed, right?
A. Okay.

Q. Yes?

A. Yes.

Q. Now, as promised, we'll get to the February 13th letter.

(PLAINTIFF'S EXHIBIT 4 MARKED FOR IDENTIFICATION)

Q. Now, I want to put on the record that I am confident that the telephone number that appears on the upper right, the asterisk that appears on the right, and the big circle were not likely on the version that you received, but this is the only one I could find.

A. What, this Villager Publication?

Q. No. I'm looking at this phone number here, this handwritten phone number here, the asterisk, and the big circle around the second to the last paragraph. They are completely irrelevant for my purposes unless you tell me you find something significant about them.

A. No.

Q. So, this is that letter from Mr. Peretine that you are referring to?

A. Right.

Q. I'd like to ask you, after you have a chance to review it at whatever pace you'd like, to tell me

where it talks about, or where it varies from your proposal to pay the $475,000, when the refinancing is completed?

A. I'm not sure what you're asking about.

MR. MARCACCIO: I'm going to object to the question, and from time to time you may hear me object. I'm not instructing you not to answer. You're going to continue to answer, but that's just for the record. So my objection is to that question.

Q. I'm going to start it a different way. I'm going to ask you a completely different question to start, sir. Your signature is on the bottom of this letter?

A. Right, it is.

Q. So when you talked about the agreement or the February 13th letter, this is the one you're talking about?

A. Right.

Q. I'd like to ask you where -- focusing on the specific item in your proposal that says you will pay the $475,000 when the refinancing is completed, focusing on when the refinancing is completed, I'd like you to tell me where it is in Mr. Peretine's letter that you think says it's not

when the refinancing is completed, it's some other time?

MR. MARCACCIO: Objection. You may answer it.

A. You have confirmed your agreement to continue to make payments -- let me just read this.

Q. Let me make a suggestion, sir. I don't mean to be rude by any stretch. If you talk, he's got to type. So if you want to read it to yourself, I think you should. If you're going to read it out loud, I think you have to speak slower.

(WITNESS REVIEWS DOCUMENT)

THE WITNESS: Okay. Can I read this?

MR. EMANUEL: Sure.

A. Okay. It says, "As well as all additional scheduled monthly payments thereafter until such time as All Points receives payment in full of $475,000 stipulated amounts." Until -- there it is, additional scheduled monthly payments thereafter until such time as All Points receives payment in full of the 475. That's where I got the information from.

Q. What part of that sentence suggests to you that the $475,000 was not required to be paid at the completion of the refinancing of your house?

MR. MARCACCIO: Objection. You may answer.

A. Okay. Until such time as All Points received payments in full of the 475.

Q. According to your proposal of February 10th, All Points was going to receive that $475,000 out of the refinancing of your house, right?

A. Okay. No. I mean they were going to receive $475,000.

Q. I'll rephrase the question. When the refinancing is completed.

A. Okay. Yes.

Q. What -- I'm going to try and ask a different question. The language you just quoted to me, all additional scheduled monthly payments, what is it about that that says to you that the completion of the refinancing is no longer the operative time to pay the $475,000?

MR. MARCACCIO: Objection. You may answer.

A. Because at that time I said to Cathy Wilinski, under this letter I am not sure that I can comply by giving you the $475,000 all at once. She said you'll have to make some -- then you'll have to make some arrangements to continue to pay

it. So, I read from her conversation and read in here that I had an additional time to pay the 475.
Q. Okay. All Points Capital didn't know when you were going to refinance?
A. No, they didn't.
Q. Did you know when you were going to refinance?
A. No. It just happened that it went through very quickly.
Q. So in the February 10th letter which I'll put in front of you, you propose that all payments made up until this point would have been credited toward the $475,000?
A. Right.
Q. Is that right?
A. That's right.
Q. And Mr. Peretine says in this paragraph, well, tell you what we'll do, Mr. Ritacco, and of course I'm paraphrasing, from the day you sign this revised agreement, this February 13th letter, any payments you make after that will count towards the 475; is that your understanding of this letter?
MR. MARCACCIO: Objection. You may answer.
A. I'm not sure. I don't think I looked at it

quite that way. I don't know what you're really asking me.

Q. I'm asking you when you signed this letter, what payments were going to get credited towards your $475,000 obligation?

A. Whatever he stipulates in there. Absolutely. Okay. I understand that.

Q. So the payments made after February 13th?

A. Right.

Q. And, again, All Points had no idea when you were going to refinance?

A. No.

Q. The only language that you're relying on for an extension of time, excuse me, the only language in this letter that you're looking at, Exhibit 4, that suggests to you that you had a longer period of time than the completion of the refinancing of your house is the reference to additional scheduled monthly payments thereafter --

A. Right.

Q. -- until such a time as All Points receives payment in full of the $475,000?

MR. MARCACCIO: Objection. You may answer.

Q. Is that right?

A. Yes.
Q. And according to your proposal, your first proposal to which this letter responds, the time that it was going to receive the $475,000 -- let me finish. The time that you were going to pay that money was at the completion of the refinancing of your house; is that right?
A. No, and I'll tell you why. I mentioned to them -- that letter -- that letter was -- this letter really has no bearing anymore as far as in my mind. This is the letter I have to comply with right here.
Q. I understand that.
A. So this one here tells me that I have -- they -- they knew, from you, I assume from somebody, that the house did not value at -- I couldn't get $475,000. You had it appraised at 484,000. I had it appraised that I could only get 500,000, owing $150,000. So, therefore, I think I knew and I think you knew and Cathy Wilinski knew that I did not have -- I couldn't get the total $475,000 out of the house. There was not enough value in that house.
Q. So why did you propose to pay $475,000 at the time your refinancing was completed if you knew you

couldn't get the money?

MR. MARCACCIO: Objection. You may answer.

A. Because when I received this letter --

Q. February 13th.

A. The February 13th letter, I read in there that whatever amount I gave them, I could continue paying 6,500 a month as they had stipulated previously until it was paid off.

Q. What I'm asking you then is three days before that letter, which is the February 13th letter, on February 10th you wrote to All Points saying I will pay you $475,000, minus payments made to date, upon the completion of the refinancing of my house. A few minutes ago, you just testified that you knew you couldn't get $475,000 out of the refinancing of your house -- hold on, let me ask the question. Why, if you knew you couldn't get the money at the completion of the refinancing of your house, would you offer to get the money at the completion of the refinancing of your house?

MR. MARCACCIO: Objection. You may answer.

A. Not being an English major, the 475,000 was the main objective. I knew that I was going to

give them all the money I could get out of my house, and I just -- I just -- my assumption was that giving them all that money at one time along with the continued monthly payments would satisfy the 475,000.
Q. When you wrote this February 10th letter, you didn't say I'll give you all of the money out of the refinancing of my house?
A. Just an assumption because you had a lien on it and whatever was there was what I had to give.
Q. You specifically put down a number of $475,000?
A. Right.
Q. And at the time you wrote that, you knew you couldn't get $475,000 --
A. Out of the refinancing, that's absolutely right, yes.
Q. In the February 13th letter, which is Exhibit 4, the third paragraph, the last sentence on the right begins with the word "finally."
A. Yup.
Q. I'm going to read it into the record, and please correct me if I read it incorrectly. "Finally until such a time as All Points has received the stipulated amount in full, it shall continue to maintain its interest in the Fast 300 and shall

not waive any other rights or remedies it may have under contract or at law." Do you see that?
A. Yes, I do.
Q. Did I read it right?
A. Yes.
Q. Are you aware that All Points Capital had a secured interest in the Fast 300?
A. Yes.
Q. What is a secured interest?
A. They own it until I pay it off.
Q. So, when you got this February 13th letter and you signed it, did you see the part about maintaining its interest that I just read into the record?
A. I certainly did.
Q. On the same day as you made your proposal to Miss Wilinski, Mr. Chase wrote a letter on your behalf, didn't he?
A. Yes.
(PLAINTIFF'S EXHIBIT 5 MARKED FOR IDENTIFICATION)
Q. I'm going to show you what's been marked as Exhibit 5.
A. Okay.
Q. Have you seen this document before?
A. Yes.

Q. And what do you understand this to be?
A. A kind of purchase and sales agreement between Ken Ubert and myself.
Q. For the Fast 300?
A. Yes.
Q. Same Fast 300 that we've been talking about?
A. Yes.
Q. I assume there's only one?
A. There's only one.
Q. And you said it's something like a purchase and sales agreement, correct?
A. Yes.
Q. I'd like to look at Item Number 8, "Beacon/Ritacco warrants there are no liens or encumbrances on the machinery and will hold Ubert harmless and indemnify him against any claims in that regard." At the time of this February 10 letter --
A. Yup.
Q. -- was the Fast 300 free --
A. No.
Q. -- of liens?
A. No.
Q. But yet your attorney warranted that it was?
A. Yes. Can I tell you on what assumption?
Q. Sure.

A. On the assumption that I was going to pay the $475,000 off, and then it would become a moot point.
Q. When were you going to pay the $475,000 off at the time of this letter?
A. Whenever I could get the money to pay it off. Whatever the letter of February 13th, was my understanding that was what I was going to comply with.
Q. Okay. And if you look at Paragraph 10 which is on the top of Page 2, "This agreement is contingent on the buyer obtaining a satisfactory report from a UCC search which includes the Fast 300 and all asset search."
A. Yup.
Q. Do know what a UCC search is?
A. Yes.
Q. What is a UCC search?
A. To see who has a lien on the equipment.
Q. And do you know if a UCC search was ever done?
A. No.
Q. Did you ever tell Mr. Ubert that there was a secured interest in this Fast 300?
A. No.
Q. Did Mr. Chase ever tell him?

A. I don't think so.
Q. Understanding you cannot get inside Mr. Ubert's brain, is there anything that you're aware of that -- is there anything you know of that Mr. Ubert would know that this piece of machinery is still secured?
A. No. It would be secured by me because he hadn't paid me off. So, he wouldn't have any concern.
Q. Did you file a UCC --
A. No, I couldn't file a UCC.
Q. What about All Points' security interest, does he know about All Points' security interest?
A. Does he own it? No.
Q. What do you mean --
A. Does he know what you said? No.
Q. Does he know that All Points Capital still has a UCC interest?
A. No, no.
Q. A recorded security?
A. No, I don't think so, not unless you told him.
Q. I haven't told him yet.
A. You must remember, too, in the back of my mind, up until this point, All Points Capital had

never once wanted to know anything about the equipment, never asked to see it, never asked to do anything.

Q. We'll get to that, too.

A. Okay.

Q. I'm sorry, I don't mean to go backwards, it's not my style, but I'm going to ask you to look back at this February 13th letter again. In the third paragraph, it says, "You agree to use your best efforts to expedite the refinancing of your house and to keep All Points informed about the progress of such efforts including sending to us a copy of the written commitment from the financial institution providing the refinancing." Did you ever do that?

A. I don't think so, no.

Q. Which happened first, your letter of February 10th to Cathy Wilinski, which is Exhibit 3, Mr. Chase's letter to Ken Ubert, which is Exhibit 5, which of those happened first?

A. I honestly don't know. They could -- they're probably pretty much simultaneously. Coincidentally, they were all simultaneously because I had been trying to sell the press right along. I put ads in the paper. I've done a lot

of things to try to expedite the sale which -- try to get this press sold, but there were never any bites. So, I would guess -- I really don't know. I would think that they're probably pretty much simultaneously.

Q. So, at the same time, you are proposing to reduce the amount you owe to All Points Capital?

A. Yup.

Q. Your attorney is selling the piece of machinery, that is, securing your obligations to All Points Capital?

A. Okay.

Q. And in your letter of February 10, you don't mention anything about the sale of the machine?

A. I didn't think there was any need to say. They had -- they never had any interest in the press up until that point. Why would they have an interest -- because I was going to satisfy the 475, so I did not think there would be -- it would be a moot point.

Q. They had a secured interest in the machine?

A. They did, but they never once asked me where the press was or ever wanted to look at it, wanted to know if it was ever insured.

Q. And if they did ask those questions, would you

have answered them?

A. Of course. It was right there. They never came and looked at it. Their main concern was, all they said to me was we're not interested in the press, Mr. Ritacco, we're interested in the money.

Q. Okay.

(PLAINTIFF'S EXHIBIT 6 MARKED FOR IDENTIFICATION)

MR. EMANUEL: Can I have the last question and answer read back.

(PENDING QUESTION & ANSWER READ BACK)

Q. Mr. Ritacco, have you seen this letter that's addressed to you that is in front of you as Exhibit 6?

A. Okay, I don't recall it, but I must have seen it.

Q. If you turn to the last paragraph before Miss Wilinski's signature --

A. Okay.

Q. It asks for full written disclosure within five days of the location and the press, excuse me, of the press, and immediate access for inspection and/or possible removal, if warranted, to a safe and secure location for remarketing. Do you see

that?
A. Yes.
Q. Did you ever answer that request?
A. No.
Q. Two minutes ago you told me that if they asked you, you would have told them. Here they asked you. Did you ever tell them?
MR. MARCACCIO: Objection.
A. I didn't tell them because I had paid -- I had then sent you the check for the remaining balance of $475,000, right; is this the same time?
Q. I'm looking. No, sir. Your check for $58,000 and change was sent on September 13th. So, here's a request on September 5th for written disclosure of the location of the press and access for inspection, which a few minutes ago, you testified if they asked, you would tell them.
MR. MARCACCIO: There's no question. All you have to say is yes or no. He's going to ask you a question.
Q. So here they asked?
A. Yup.
Q. Did you ever tell them?
MR. MARCACCIO: Objection. Asked and answered. You may answer again.

A. No.

Q. Why not?

A. Because I made out the check to send to them, and I figured it was a moot point. The check -- maybe -- Joel and I discussed it. I would pay it off.

Q. Don't tell me anything about what you and Joel discussed. It's not my business to know it. I don't want to know it. I'm not privy to those. I don't want it. But before you even paid off the stipulated amount as you read these letters, All Points asked you where is the machine?

A. Yup.

Q. Did you tell them?

MR. MARCACCIO: Wait, wait, wait.

Q. Did you tell them?

A. No.

MR. MARCACCIO: Wait a minute. This is the third time. So here's my view of it. We're here to learn about any facts you need to know in your case. I understand that. That is -- we're at the point now when we start asking questions like that, in my opinion and as his counsel, that's argumentative. And I'm here just to make sure he gives you facts. I understand your

position in the case, but asking three times in a way that I think is attempting to be argumentative, I don't think that's appropriate for a deposition.

MR. EMANUEL: Okay.

MR. MARCACCIO: But Mr. Ritacco is here to give you the facts he has. Go ahead.

Q. You hadn't drafted that $58,000 check by September 5th, right?

A. No. And the reason I hadn't drafted that check --

MR. MARCACCIO: Wait for the question, please.

Q. Was there a reason you hadn't drafted that check?

A. Yes.

Q. What was the reason?

A. Because I had sent a letter to Cathy Wilinski to see if I could get some forgiveness on the 475,000.

MR. EMANUEL: Okay. Can I have this marked as 7, please.

A. Then she sent back to me that no, we could not. There was nothing we would do, and so then I drafted the $58,000.

(PLAINTIFF'S EXHIBIT 7 MARKED FOR

IDENTIFICATION)

Q. Mr. Ritacco, this letter is dated September 8th. It was from you. It is dated three days after the letter that is Exhibit 6. Is this the letter that you were referring to that you sent to Miss Wilinski?

THE WITNESS: I'll read it.

MR. EMANUEL: Sure.

(WITNESS REVIEWS DOCUMENT)

MR. MARCACCIO: Do you have a copy just so I have a copy of everything?

MR. EMANUEL: One thing I've got is copies.

A. Okay. Yes.

Q. Is this the letter that you referred to in your previous answer?

A. No, this is not -- the letter that I sent her was asking her for -- if I could relinquish 20 or $30,000 to make a payment.

Q. Is it a handwritten letter?

A. No. It was a letter that I typed asking for her -- asking if she could forgive a portion of the 475.

Q. Okay. Maybe I'll find that in the documents that were produced today. I'll go look. But this --

okay. So this September 8th letter, which is Exhibit 7, came three days after Miss Wilinski's September 5th letter.

A. Okay.

Q. And in this September 5th letter, she asks for information about the location and condition of the press?

A. Right, yes.

Q. Did you type this letter that's dated September 8th?

A. No. My attorney's office typed it.

Q. Did you participate in the drafting of the letter?

A. Yes.

Q. At no point in this letter do you discuss the location or whereabouts or condition of the press; is that right?

A. Right.

Q. If you look on the first page, the fifth paragraph, you acknowledge that the February 13th letter stated that All Points would continue to maintain its interest in the Fast 300 until the $475,000 was paid in full?

A. Right.

Q. By September 8th, was the $475,000 paid in full?

A. No.

Q. Where was the machine on September 8, 2006?
A. Milwaukee.
Q. When did it go to Milwaukee?
A. March or April.
Q. At that time, did you tell All Points Capital that the machine was being transferred to Milwaukee?
A. No.
Q. Why not?
A. Because I didn't think they really cared because for the simple reason that they never cared where the press was at that point, up until that point. They never asked me to look at it up until that point, and I was well aware that I was going to satisfy the $475,000 judgment and so I didn't think it was necessary for them to know.
Q. Okay. And you made that decision even though on February 13th you signed a letter agreement that acknowledged that All Points was maintaining its interest in the Fast 300 until the $475,000 was paid?
A. That's right. And their secured interest would be more secured having it out in Milwaukee up and running.
Q. Why is that?
A. If it's up and running, it has more value

than being in a warehouse as a bucket of bolts.

MR. EMANUEL: Okay.

(PLAINTIFF'S EXHIBIT 8 MARKED FOR IDENTIFICATION)

Q. Mr. Ritacco, have you seen this letter before?

(WITNESS REVIEWS DOCUMENT)

A. Yes, okay.

Q. And this letter follows just several days from the prior letter we looked at, which was September 8th?

A. Right.

Q. In this letter, I see that Miss Wilinski asks for information about the location of the press?

A. Right.

Q. And making it available for inspection?

A. Right.

Q. At the time she made this request on September 11, 2006, did you respond by telling her any information about the location of the press?

A. No.

Q. Why not?

A. Because I had every intention of giving her the $60,000.

Q. And in your mind --

A. I thought that was a moot point.

Q. That excused your failure to provide the information?
A. Right, well, yes.
Q. In your mind?
A. In my mind, yes.
(PLAINTIFF'S EXHIBIT 9 MARKED FOR IDENTIFICATION)
Q. Mr. Ritacco, the document that's been marked as Exhibit 9 that is in front of you, have you seen this before?
(WITNESS REVIEWS DOCUMENT)
A. Yes.
Q. What is this document?
A. It's a document, promissory note from Ken Ubert to pay off the press.
Q. Has Mr. Ubert satisfied his obligations under this promissory note?
A. No. I mean -- well, yes, he has, and he hasn't. $5,000 is still owed and the latest payment has not come. So he hasn't --
Q. Okay. Other than a $5,000 payment, is he current?
A. No. He's $3,800 behind.
Q. Okay. So he's one payment, one regular payment and one $5,000 payment behind?
A. Um-hum.

Q. The note is dated March 15, 2006, correct?
A. Um-hum.
Q. Is that on or about the time the machine was transferred to Wisconsin?
A. Yes.
Q. How did it get there?
A. I had it trucked.
Q. How big a machine is it?
A. Three times the size of this room, took three trucks -- took three trucks to get it there.
Q. I'm now giving you back what's been already marked as Exhibit 5, which you described as a purchase and sale letter agreement of some type. We talked about at the time of February 10th, I believe you testified that the machine was not free and clear of the liens, but, yet, you anticipated that it would be free and clear --
A. Right, yes.
Q. At the time that the machine was transferred to Mr. Ubert, physically sold, sold to Mr. Ubert, was it free and clear of liens?
A. No.
Q. Did you ever advise him of that?
A. No.
Q. So point Number 8 on this letter agreement was not

only untrue at the time that it was written, it remained untrue even through and including the sale of the machine?

A. Yes.

Q. Were there any other documents signed or exchanged between Mr. Ubert and yourself or Mr. Ubert and Mr. Chase regarding the sale of the machine?

A. No.

MR. MARCACCIO: I should note for the record that what I reviewed this morning, I gave to you. So there are --

MR. EMANUEL: I haven't had a chance to look yet.

MR. MARCACCIO: He may not even be aware --

MR. EMANUEL: I'll withdraw the question until I get through the documents.

MR. MARCACCIO: There are others there, including the time that the press was actually transferred. I think there might be a date which might be in February --

Q. Any payments that you made -- let me start over. Although I haven't looked through the documents, you made -- a transfer of almost $350,000 was made for your benefit on February 28, 2006 to All

Points?
A. Yes.
Q. You understand that?
A. Yes.
Q. Was that from the refinancing of your house?
A. Yes.
Q. The refinancing was completed on that date?
A. Yes. Wire transferred to them, yes.
Q. There were no further disbursements coming from the refinancing of your house after that one?
A. No. What do you mean, further disbursements?
Q. I didn't know if that was the first of several payments you were going to receive from whoever refinanced your house?
A. No.
Q. It was a one-time transaction from the bank?
A. Right.
Q. Who is the lender that refinanced your house?
A. Chase.
Q. I assume that's not Joel?
A. No. Chase Home Finance.
Q. So any payments you made after February 28th had nothing to do with the refinancing of your house?
A. No.
Q. Correct?

A. No. They did not.
Q. I asked a question --
A. Yes. They did not.
Q. In September of 2006, and we talked about this, you can certainly refer to the documents, one is dated September 11th, September 5th, September 8th, Miss Wilinski several times asked you what the status of the machine was?
A. Yes.
Q. At any point, did you tell her it was sold?
A. No.
Q. Even though it was sold six months earlier?
A. Right.
Q. Other than the machine, this Fast 300 machine, were there any other assets of Beacon Press after you closed the business?
A. Nothing. I had to pay off -- I paid off all the creditors, you know, and all the people that helped me out over the years, you know, the 300, 30 something years I was in business.
Q. Were there any accounts receivable?
A. They went to pay off the creditors.
Q. Was there a customer list?
A. Yes.
Q. Did you sell the customer list?

A. No.
Q. Were there any -- after you paid off all the creditors, was there any money left over?
A. Nothing to speak of.
Q. Other than the Fast 300, were there any other assets of Beacon Press that you sold?
A. Yes.
Q. What did you sell?
A. A press.
Q. A different press?
A. Yes.
Q. Is it the Harris Press?
A. The Harris. Never did sell. It's still in the warehouse. It's not sold.
Q. Is it on consignment somewhere?
A. Yes, right.
Q. Someone is trying to sell it?
A. Right.
Q. What do you think the value of that in terms of the sale price are?
A. 125,000, a hundred thousand, somewhere in that neighborhood.
Q. Other than the Harris Press, was there also some other machinery, other -- I'm now just remembering this as I was talking to Joel back in the day,

were there other smaller pieces of equipment?
A. That just went up to a -- I sold it to a house up in -- the New Herald Press in Pawtucket, which they still haven't paid me for.
Q. When you say a house, you mean a printing house?
A. Printing house, yes.
Q. How much did you sell that equipment for?
A. $40,000.
Q. Did you take back any kind of -- did you take back paper?
A. I have a note, I think. I don't know where it is, but I have a note.
Q. Do you know when the note comes due?
A. They're supposed to be monthly payments. They never paid me.
MR. EMANUEL: All right. I need to take some time to look through these documents. I -- just for the record, I've given both you and Mr. Marcaccio a choice as to whether you want me to look at them now, which make take a little while while you wait, or whether you want me to look at them on my own time, and ask you to come back. You prefer me to do it now. I'm happy to do it now.
THE WITNESS: I prefer to wait.

MR. MARCACCIO: Just as I said off the record --

MR. EMANUEL: Wait, this is off the record or as you said off the record?

MR. MARCACCIO: As I said off the record, now saying on the record, you said I think a vast majority of these documents you've seen before. So, I don't expect there to be a lot here that's new; but whatever is new, that's why we're sending it over.

MR. EMANUEL: I just need the chance to look. Why don't we take a little break.

Q. Mr. Ritacco, one more question before we take a little break. Showing you what we called the purchase and sale agreement letter for the Fast 300 between yourself and Mr. Ubert, if you could look at Bullet Point Number 9, it talks about, if I can find it, Ubert is agreeing to purchase the Fast 300, 8-unit press, that's the same Fast 300?

A. Right.

Q. "See the attached list Exhibit A and truck manifest which includes the items included with this agreement." Do you know what that means?

A. Yeah. I'm sure that when they put the pieces on the truck for delivery, they would -- they will

have those items documented. So when they get to the other end, those are the ones that would be on there. Okay. I don't know, you know, I have no other explanation for what that means.

MR. EMANUEL: Fair enough. Thank you. Now we're going to take a break. Off the record.

(OFF THE RECORD)

(PLAINTIFF'S EXHIBIT 10 MARKED FOR IDENTIFICATION)

Q. Mr. Ritacco, I've taken a short bit of time to look through the documents that Mr. Marcaccio produced today, and I have two specific pages that I just need to ask you a couple of questions about.

A. Sure.

Q. The first I will proffer to you that this is the printout -- are you a computer guy?

A. No. I'm an illiterate.

Q. This is a printout of an electronic mail communication from Gus Izurieta to Ken. From time to time, as attorneys for All Points Capital, we were notified that you thought you had a potential buyer for the Fast 300.

A. Okay.

Q. Ultimately, we learned today that it was sold to

Ken Ubert or his company?
A. Right.
Q. Were there any other Kens that you know of that were potential buyers of the machine?
A. Not that I can recall.
Q. Now, this e-mail, if you look on the second line where it says "date" up near the top?
A. Okay.
Q. Mr. Izurieta was having communications with Ken back in late January of 2006?
A. Okay.
Q. And as I recall, that's about two weeks before the purchase and sale agreement letter we looked at, which was dated February 10; is that right?
A. Okay, yup.
Q. And who is Gus Izurieta?
A. He's a, what do you call it, a broker.
Q. Was he trying to broker a sale for you as the seller?
A. Yes.
Q. So was he your broker?
A. He was an independent broker, brokering. So he knew I had the press. He was trying to broker it to Ken Ubert.
Q. What I'm trying to find out was, was Gus working

for you or was Gus working for Ken, or how it came to be?
A. I paid him. So, I guess he was working for me.
Q. That's a pretty good indicator?
A. I paid the fee.
Q. Do you know --
A. This is not the final arrangement.
Q. I understand that. I understand that. The first sentence -- the first line under the word Ken talks about equipment that Ken saw in Mr. Ritacco's press room in West Warwick, Rhode Island?
A. Yes.
Q. Were you there when Ken was there?
A. Yes. Came to look at the press, yes.
MR. EMANUEL: Okay. Let's move on to the next one.
(PLAINTIFF'S EXHIBIT 11 MARKED FOR IDENTIFICATION)
Q. Mr. Ritacco, this is a second electronic mail message which, unfortunately, gets cut off, but the one I looked at was addressed to Ken, we see the E-N here. I should go get the original, in fact will -- why don't I just do that. I'm sorry.

Let's get one that's not cut off.

(PAUSE)

MR. EMANUEL: Can we -- back on the record. The first Exhibit 11 I had shown had the left margin kind of cut off by a character or two. So we now substituted a new Exhibit 11 which has no characters cut off.

Q. Mr. Ritacco, this is another electronic mail message, at least as far as I can tell, and this one appears to be from Joel Chase, correct?

A. Yup.

Q. And Mr. Chase, back in March '06, was your attorney?

A. Yes.

Q. I'm looking at the second paragraph of the letter where Mr. Chase reconfirms that the subject machinery you have purchased, and the "you" in that case I believe refers to Mr. Ubert, is purchased free of all liens and encumbrances, including those associated with All Points Capital. Do you see that?

A. No.

Q. Okay. I'm glad you told me that.

A. Oh, the second paragraph.

MR. MARCACCIO: Right there, yup.

A. Okay, yup, okay.

Q. Your testimony earlier was that your understanding was that All Points' lien, its security interest in the machine, was maintained, I think was the word that was used, through and including the date the stipulated amount was paid in full?

MR. MARCACCIO: Objection. You may answer.

A. Okay.

Q. And your belief is that the stipulated amount was paid in full on September 13 when you tendered a check of about $59,000?

A. Right, yes.

Q. This letter is dated March 14, 2006. Am I correct, then, that your belief as of March 14, 2006, your belief, not Joel's, but yours, was that there still was a lien or a secured interest in the machine by All Points Capital?

MR. MARCACCIO: Objection. You may answer.

A. Yes.

MR. EMANUEL: Off the record for a second.

(OFF THE RECORD)

MR. EMANUEL: I have no further

questions.

EXAMINATION BY MR. MARCACCIO

Q. Let me ask a few so that we're clear.
Mr. Ritacco, have you made an effort to determine how much you ever paid to date to All Points?
A. Yes.
Q. And based upon your review of documents -- strike that. What have you reviewed to determine how much you paid to date --
A. From the date -- I went back to the date we made the first payment, in March or April I guess it was. I paid them $545,000 to this point.
Q. At any time have you attempted to remove the UCC filing?
A. No.
Q. Have you had any discussions with Mr. Ubert concerning the UCC filing?
A. No. I didn't, no. I mean, he might have asked for them, and I said you're not getting them until -- I mean I don't remember, but I'm going to say specific questions or answers to that, no.
Q. Just see one more thing. Could I see Exhibit 3 and Exhibit 4. Thank you. Directing your attention to Paragraph 2 of the February 13, 2006

letter, this is one that's been marked as Exhibit 4. Could you take a look at that for just a second.
A. Sure.
Q. And then focusing on the first sentence, do you remember reading that sentence at the time that this was sent to you?
A. Yes.
Q. Did you read this entire document before you signed it?
A. Yes.
Q. Now, at the time that you signed this, what was your understanding with respect to the first sentence of Paragraph 2?
A. Some terms -- the terms that they made some changes in my letter.
Q. And what was your understanding as to what the change was?
A. The change was that I was to pay them 475 -- that I would -- settlement of $475,000, that I would take the money on refinancing my house to pay them the 475 and then continue making payments of $6,500 a month until it was paid off. That was my understanding in my mind.
Q. Now, originally what was your understanding with

respect to the consent judgment, did you have an understanding as to how much time to pay the entire judgment of over $600,000, I think it's 608,000, what was your understanding?
A. I had seven years to pay that off.
Q. Now, as of the time that you made the payments, up to, let's say, September of 2006, for how long had you been making payments?
A. Every month from, I don't know when we started but it's all in the, you know, I never missed a month. In some cases, I paid double. I paid over -- in some cases, instead of the 6,500, I paid some -- 2,400, 10,000, whatever I could afford to pay on that month.
Q. When you spoke to -- this -- the Exhibit 3 which you have a copy of, this is the one that's been marked. Mr. Emanuel spoke to you about the phone conversation that this letter refers to. Directing you back to a phone conversation that you had with Ms. Wilinski, do you recall having any discussion with her as to how much time you thought you would need to get the refinancing in order?
A. I said I didn't know but I said -- I think I said somewhere -- he said by March or something,

but I don't know. There was no specific date. I was just to keep them apprised of when we were -- when the refinancing was to take place. I didn't contact her on the paperwork because they had a lien on the property, and they knew all the money that came out of the property would go directly to All Points Capital.

Q. So, to date, have you made any efforts to remove the UCC filing?

A. No.

Q. In connection with the press?

A. No, none. The other thing that has never happened -- I don't know if you put this on the record or off the record?

MR. EMANUEL: Everything you say is on the record.

A. Well, she was supposedly, once I did the refinancing, the lien on my property was supposed to be removed and that never has been done.

MR. MARCACCIO: Okay. Mr. Ritacco, I have no further questions.

RE-EXAMINATION BY MR. EMANUEL

Q. I'm allowed to get a tiny bit of follow-up. I promise it's going to be quick. Your refinancing occurred around February 28th?

A. Yes.
Q. And All Points Capital received $349,000 and change from the refinancing?
A. Right.
Q. Was that all of the cash that came out of your property?
A. Yes.
Q. From that refinancing?
A. Yes.
Q. Since that time, since February 28th, you have made, I believe $119,000 in payments?
A. If that's what it says. Everything is there, yeah, okay, yes.
Q. What have been the source of those funds?
A. My wife, myself, just -- I've done some consulting work.
Q. Savings, and continuing employment?
A. Right, yeah.
MR. EMANUEL: Okay.
RE-EXAMINATION BY MR. MARCACCIO
Q. Just to follow up on Mr. Emanuel's last question, at any time that you made the payments after you made the payment of approximately $350,000, did anyone from All Points ever question the receipt of that payment and ask you why you haven't paid

everything at one time in February?
A. No, no one, ever. They continued to accept payments after that.
Q. Did any objection -- was there any objection asserted by All Points on behalf of All Points regarding receipt of those monies that were forwarded to them?
A. Nothing, nothing.
MR. MARCACCIO: Okay. Thank you.

FURTHER EXAMINATION BY MR. EMANUEL

Q. My turn. As of March 1st, meaning the day after February 28th, whether -- the amount you owed All Points was $475,000 or, excuse me, let me start over. As of March 1st, whether the amount of money that you still owed to All Points was the difference between what got paid up to 475 --
A. Yes.
Q. -- or the difference between what you paid and $608,000 under the consent judgment, you still owed money to All Points as of March 1st, correct?
A. That's right, yes.
MR. EMANUEL: Okay. I think now we're done.
MR. MARCACCIO: I'm going to take a copy.
(DEPOSITION CLOSED AT 4:27 PM)

*****************

C-E-R-T-I-F-I-C-A-T-E

I, RONALD M. RONZIO, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of Anthony Ritacco, a Defendant in the above-entitled cause, was taken before me on behalf of the Plaintiff, at Chace Ruttenberg & Freedman, LLP, One Park Row, Providence, Rhode Island on December 7, 2006 at 2:00 p.m.; that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned to testify to the truth, the whole truth, and nothing but the truth, and that he thereupon testified in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer, and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rules 5(d) and 30(f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in Court; therefore, the original is delivered to and retained by Plaintiff's Attorney, Douglas J. Emanuel.

I have enclosed with the deposition a correction and signature page which must be signed before a Notary Public.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 27th day of December, 2006.

__________________________________________________

RONALD M. RONZIO, NOTARY PUBLIC/CERTIFIED COURT REPORTER

IN RE: All Points Capital Corp. v. Beacon Press Corp, et al.

DATE: December 7, 2006